Adell C. CARTER, alias Ponto, and Ronnie Mae Mathis, Appellants,

v.

UNITED STATES of America, Appellee.

No. 15734.

United States Court of Appeals Fifth Circuit.

March 27, 1956.

Rehearing Denied April 24, 1956.

Writ of Certiorari Denied June 11, 1956.

See 76 S.Ct. 1052.

W. O. Cooper, Jr., Macon, Ga., John M. Robbins, Macon, Ga., for appellants.

Floyd M. Buford, Asst. U. S. Atty., Macon, Ga., Frank O. Evans, U. S. Atty., Macon, Ga., for appellee.

Before BORAH, TUTTLE and BROWN, Circuit Judges.

BROWN, Circuit Judge.

Armed with his badge of office, protected by the power of the sovereign whose work he was doing, but unequipped with shoulder pads, crash helmet or other paraphernalia adequate for the event, Poe, a United States Internal Revenue Agent, underwent a harrowing experience while desperately trying to maintain his precarious hold on Carter's convertible as it was speeding 60 miles per hour through the streets of East Macon, Georgia. For thus imperiling an officer in the performance of duty, Carter and his companion were found guilty of forcible obstruction and interference under 18 U.S.C.A. § 111.[1]

It all came about as Government Agents were conducting a search of the Lincoln Club, a "juke joint" in East Macon, Georgia, seeking evidence of lottery operations by persons who had not obtained gamblers' occupation tax stamps, 26 U.S.C.A. §§ 3290–3294. While the search, under a search warrant, was in progress, several persons were arrested as they came into the Club possessing brown paper sacks which were found to contain money and lottery tickets. The driver of an automobile arriving shortly before Carter's likewise had in his possession the hallmark of the calling—the brown paper sack. Shortly, Carter's vehicle stopped on the Club's parking lot (included within the premises described in the search warrant) about eight feet from the Club's entrance, and as the car's horn was blown, someone said, "There's Ponto"—a term Poe knew to be Carter's usual nickname. From reliable informants several days before, Poe knew that Ponto was in the lottery business.

Poe immediately went outside, proceeded directly to Carter's vehicle, opened the car, simultaneously saying, "Ponto, I am a Federal Officer" and saw on the rear seat floor the telltale brown sack. Events were occurring rapidly. Ponto said, "If you're a Federal Officer, show me your badge", but before Poe could get his badge from his pants pocket, Ponto abruptly started up the car. This left Poe neither in nor out, but with the door slightly open, one foot on the floor, one hand on the back of the front seat, and the other on the vent shield, he managed somehow to hang on. To Poe's repeated insistence that he was a Federal Officer, Ponto gave the same refrain, "Show me your badge." In the meantime Ronnie Mathis, holding her infant child in her arms, attempted to push Poe's arm and hand away from his grip on the back of the front seat. Ponto reached back, got the brown sack,[2] threw it out, and then started slowing down.

---

1. 18 U.S.C.A. § 111: "Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 [this includes Internal Revenue] of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both. * * * "

2. The paper sack was soon retrieved by a fellow officer; as anticipated, it contained money and lottery tickets.

Poe could now safely reach his pants pocket and when his badge was displayed, Ponto stopped.

Appellants insist that since they had no reason to know that a person dressed, as was Poe, in ordinary civilian sports clothes was a Federal Officer, they had the right to flee, were under no duty to give Poe a free and safe ride and could take all indicated action to shake their intruder.[3] And, if their knowledge of Poe's status was a jury issue, then, they claim, the same avenues were open since the search of the automobile was illegal and no valid arrest was, or could have been, made.

■■ None of these contentions is sound. Undercutting all of them is the jury's finding implicit in the verdict of guilty that each knew that Poe was a Federal Officer engaged in his official duty. This was a fact essential to conviction, but provable as any other fact. It is not for the defendant either on the trial for the obstruction, or in the event giving rise to it, to lay down the requirements as to the nature or kind or amount of proof of the Officer's status. His badge, his written credentials, his Commission are not the only means. His declaration of his official status may well be enough,[4] Palmquist v. United States, 5 Cir., 149 F.2d 352; Cook v. United States, 5 Cir., 117 F.2d 374; Owens v. United States, 4 Cir., 201 F.2d 749; cf. Hargett v. United States, 5 Cir., 183 F.2d 859, especially where, as here, it is repeatedly made, and its acceptance as the truth by defendants is credited through the jury's verdict of guilty.

■■ Knowing that Poe was a Federal Officer in performance of his duty, what appellants[5] did was manifestly a forcible interference. To abruptly start up the car and then perversely continue driving it at constantly increasing speed while Poe was precariously perched desperately struggling to maintain his hold and get in the car to avoid serious and certain injury were he to fall, makes it all an obstruction and intereference by the use of force. Since it all began so quickly, Poe's efforts to get into the car were as much an automatic reflex for self-preservation as they were a means of gaining access for search or other purposes. And whatever his right as an officer or an individual citizen might have been to *enter* the car, the moment it suddenly started up putting him in this predicament of great peril, he was entitled, in overcoming this unlawful obstruction, to use all of these means to prevent injury to himself. Nor is this to be viewed as though Poe was intent only on a search and subsequent arrest if he found evidence of likely guilt. Poe's function is not so limited. Whatever might, for example, have been Ponto's duty to answer, Poe undoubtedly had the right to ask questions. Ponto could not run him down to keep this from happening.

■ Though the matter is not to be determined solely by the legality of a search of Carter's automobile or the possibility of an arrest of the appellants, Palmquist v. United States, supra; cf. Whipp v. United States, 6 Cir., 47 F.2d 496, it is clear that the search of the vehicle was not unreasonable in violation of

3. Asserting that escape was from apprehension of personal harm, appellants' brief describes it: "We submit that it is a national condition, that when a Negro is confronted with something he is going to run if he gets half a chance and all this Negro man did was try to run and get away. * * * Under these terrifying and frightening circumstances that appellant suddenly found himself, * * * we believe the ruler of the lower regions would not have debated at any great length the wisdom of standing his ground, much less a Georgia Negro."

4. As to Ponto, the jury had additional evidence to credit showing prior brushes with the law and contact in them with Poe as a Federal Officer.

5. Ronnie Mae Mathis's complicity is minor, which undoubtedly accounts for her light, and suspended, sentence, but her act in attempting to dislodge Poe's grip on the seat was sufficient to make her a principal under 18 U.S.C.A. § 2(a) as one aiding and abetting.

the Fourth Amendment. The officers had reliable information that Ponto was engaged in the lottery business and, with others, would likely use the Lincoln Club in the trade. Others, as they came on the premises, were found possessing the brown bags containing the fruits and means of the traffic, and at least one other was known to have used an automobile in the business. When Ponto's car rolled up to the Club, and prior information about him and these operations and the confirmation of its general reliability from the searches and arrests thus far made on those premises, gave ample basis at that time for a discrete and prudent officer concluding that Carter was engaged in the traffic and would be carrying evidence of it in his automobile, Wyche v. United States, D.C.Cir., 193 F.2d 703; cf. Rhodes v. United States, 5 Cir., 224 F.2d 348.

There was, of course, no opportunity then to obtain a search warrant for the car alone, and Ponto's hasty flight in heedless disregard of Poe's safety shows quite plainly that the vehicle would have been long gone had the officers retired to a magistrate for a formal warrant. It thus met all of the tests for a valid [6] search of a swift and moving and vanishing thing. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543; Husty v. United States, 282 U.S. 694, 51 S.Ct. 240, 75 L.Ed. 629; Cannon v. United States, 5 Cir., 158 F.2d 952; Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L. Ed. 1879; Scher v. United States, 305

U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151; Medina v. United States, 5 Cir., 158 F. 2d 955; Turner v. Camp, 5 Cir., 123 F. 2d 840; cf. Rent v. United States, 5 Cir., 209 F.2d 893; Shurman v. United States, 5 Cir., 219 F.2d 282.

The remaining complaints have no substance. As an arrest or an attempted arrest at the time Poe first came up to the car was not made, the legality of Poe's or Ponto's actions are in no way affected by the legality or illegality of an arrest which did not take place. The charge that a mistrial had to be granted and that the Court's admonition to disregard the matters was inadequate for a spontaneous unsolicited answer [7] of a witness, and the prosecutor's statement that he had other witnesses available who would testify as had the others likewise fails. The witnesses' reference to Ponto as a bootlegger came rather naturally from the pressing cross examination testing and probing and challenging the credibility of the officers' testimony that Ponto, from prior occasions, knew Poe's status as a Federal Officer. The second incident was an offhand and unprejudicial remark casually made to indicate that the Government, out of deference to court and jury, was attempting to expedite the trial. Each was an occurrence of the kind likely to happen for which the District Judge is given wide power to handle with appropriate instruction as his informed discretion and judgment indicates.

The judgments of conviction were right and are affirmed.

---

6. This also disposes of the asserted error for declining the motion to suppress the evidence of what Poe saw, the brown bag, and later information of its contents—money and lottery tickets—furnished by officers who picked up the brown bag after Ponto threw it out of the car in flight. Palmquist v. United States, supra.

7. During Poe's cross examination, this occurred:
"Q. And you expect him to identify either one of you gentlemen that stopped him on any one of those occasions? A. The ones he knows, yes, sir. The bootleggers make it their business to know the officers."